Filed 3/21/16  P. v. Rubalcaba CA5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>HECTOR RUBALCABA,<br><br>Defendant and Appellant. | F068925<br><br>(Super. Ct. No. CRM026009)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Merced County.  Ronald W. Hansen, Judge.

John Hardesty, under appointment by the Court of Appeal, for Plaintiff and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Carlos A. Martinez and Kari Ricci Mueller, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

**INTRODUCTION**

At the conclusion of a jury trial on December 19, 2013, defendant Hector Rubalcaba was found guilty of soliciting another to commit murder (Pen. Code, § 653f,

subd. (b)).[1]  In a bifurcated proceeding, the trial court found true allegations defendant had a prior serious felony conviction within the meaning of the three strikes law (§§ 667, subds. (b)-(i), 1170.12, subds. (a)-(d)) and qualified for a prior prison term enhancement (§ 667.5, subd. (b)).  On February 11, 2014, the trial court denied defendant's motion for a new trial and sentenced defendant to the upper term of nine years, doubled pursuant to the three strikes law, plus a consecutive term of one year for the prior prison term enhancement.  Defendant's total prison term is 19 years.

Defendant contends the trial court erred in finding the prosecution failed to provide him with discoverable information pursuant to *Brady v*. *Maryland* (1963) 373 U.S. 83 (*Brady*), but then denying defendant's motion for a mistrial.  Defendant further argues the trial court erred in failing to grant his motion for a new trial based on newly discovered evidence.  Defendant contends there was prosecutorial misconduct because an investigator violated a pretrial order not to refer to defendant's gang membership and violated the confrontation clause of the Sixth Amendment in another statement to the jury.  Defendant also alleges cumulative error.  We reject these contentions and affirm the judgment.

## FACTS

### *Defendant's Relationship with Victim*

Defendant was involved in a short romantic relationship with Chrystal Ramirez during the spring of 2012.[2]  According to Ramirez, defendant carried a gun inside his pants almost every day.  At the end of the relationship, defendant became controlling.  He threatened Ramirez and members of her family.

While defendant was still dating Ramirez, he burgled a house in Atwater with friends and his former brother-in-law, Israel Barajas.  Barajas had been married to defendant's sister, Erica Rubalcaba.  They stole guns, money, and marijuana plants.  The

---

[1]Unless otherwise designated, statutory references are to the Penal Code.

[2]Unless otherwise indicated, all dates refer to the year 2012.

marijuana plants were taken to Erica Rubalcaba's house. Defendant moved to the San Jose area and changed his appearance after the burglary. After they broke up, defendant grabbed Ramirez's cell phone and destroyed it because it had pictures of the marijuana plants growing at his sister's house. Ramirez dated Barajas for a couple of weeks while defendant was away. When defendant returned to Merced and learned Ramirez had dated Barajas, defendant became upset and began to threaten Ramirez.

After defendant and Ramirez broke up, defendant would show up uninvited at Ramirez's home, at her grandmother's home, and at church. Once, defendant called Ramirez and told her to step outside. When Ramirez refused to do so, he threatened to shoot out her tires and shoot at her house. Defendant threatened to kill Ramirez if she went to the police. On the 21st birthday of Ramirez's brother, defendant was watching Ramirez and threatened to shoot her and her brother if she left the house to celebrate with her brother and friends. This conduct continued for weeks. Ramirez did not initially go to the police because defendant told her he would shoot her if she tried to go to the police. Defendant also threatened to shoot any officer who approached him.

### Victim's Contact with Investigators and Defendant's Arrest

On May 1, Ramirez contacted the police and told them about defendant's criminal activities. Ramirez tried to get in touch with defendant and sent him text messages telling him she loved him. Ramirez was afraid of defendant and wanted the police to arrest him. Defendant responded with his own text message saying he was waiting for Ramirez outside her house and he would start shooting if she did not come out.

Ramirez was in a patrol car with two officers and they saw defendant in his car in front of Ramirez's house. The officers put on their vests and dropped off Ramirez away from her house. Soon, Ramirez heard a lot of gunshots, along with the sounds of screeching tires and a car crash. Ramirez learned defendant was arrested and placed in jail. As defendant attempted to flee the police, he was shot in the neck. No firearm was seized from defendant when he was arrested.

3.

*Discovery of Defendant's Solicitation for Murder*

From text messages sent by defendant from jail to Barajas—and from questioning Barajas after Barajas was arrested on unrelated charges—Merced police officers discovered defendant had solicited Barajas to murder Ramirez. Merced police officer Cruz Jasso was assigned to the gang violence suppression unit and assisted with the execution of a search warrant for firearms on Barajas's residence on August 31. Although the officers did not find firearms or ammunition, they found growing marijuana plants. Barajas was arrested for cultivation of marijuana.

During the execution of the warrant, Jasso searched and took pictures of text messages on Barajas's cell phone. The text messages contained threats against Ramirez, and Jasso's photographs of the messages were admitted into evidence. The text messages to Barajas came from defendant.

*Defendant's Initial Text Messages to Barajas*

Dean Johnston, a special agent with the California Department of Justice Bureau of Investigation, testified as an expert with experience intercepting over 50,000 telephone calls on over 175 target phones and had interpreted some of the coded language used in defendant's text messages. After a police officer was killed in 2004, Johnston was assigned to make intercepts against criminal street gangs, including gangs involved with conspiracy and criminal street activity. Many of the intercepts were drug or gang related. In one intercept, Barajas told defendant he wanted his bail revoked so he could get at someone in jail. Defendant told Barajas to calm down because then no one would be able to take care of "the lawyer." Defendant referred to Ramirez as a lawyer and told Barajas to kill her.

In his messages, defendant complained about still being in jail facing charges. Barajas told defendant he needed a solid foot soldier so he could put himself into the public eye and have an alibi witness who could say he was not involved in killing Ramirez. Barajas told defendant he had the layout to Ramirez's house and to find him

4.

some grenades and the crime would be done. Barajas also told defendant that his sister, Erica Rubalcaba, was talking to some "actives" who wanted to "beef up," but she would not give Barajas any information.

Defendant later sent Barajas a text saying defendant expected to go to prison, did not expect Barajas to put everything on the line for him, and he loved Barajas. Johnston believed this text and another similar one that followed it should be interpreted as the defendant saying he would do the crime if there was an easy way for him to do it, but he would be the prime suspect, and Barajas did not seem to care if defendant went to prison for the rest of his life for committing a murder. Barajas responded that if there was a perfect route, he would take it.

Defendant texted Barajas back that Barajas could not deny that "'if the shoe was on the other foot, it would have been done already.'" Defendant complained of Ramirez: "'That bitch set me up, got me shot, and [tried] to wash me forever, and you [Barajas] go about life like nothing. You got influence out there.'" Johnston interpreted this point by defendant to mean Barajas had street connections, tools to get the murder accomplished, and defendant felt abandoned by Barajas. Defendant emphasized again that he would have done the job for Barajas, and if Barajas really wanted to get the job done, it would have been handled.

Barajas explained to defendant how Ramirez was difficult to get to because her home was secured by an alarm system, sensor lights, and neighbors with dogs. Barajas also told defendant he could be secretive, but he was not invisible. Defendant responded that Ramirez's home was not the only place she would be at and referred to his "fishing poles," code for long guns or some type of rifle. Barajas replied defendant was talking gibberish. Barajas knew defendant was stressed out in jail, but Barajas was trying to cover everything—including taking care of defendant, living his own life, and watching his own back.

*Questioning of Barajas after His Arrest*

After his arrest, Barajas was questioned at the police station. An audio recording of this session was played for the jury and the jurors were each handed a transcript of the interrogation. Barajas confirmed that defendant had been calling and texting him from jail concerning Chrystal Ramirez. Defendant wanted Barajas to use whatever means necessary to get rid of Ramirez. Defendant really wanted her to disappear. Barajas explained to investigators that in the text messages, defendant referred to Ramirez as "the Lawyer," "her," and "that bitch" or "that bitch that got me shot." Barajas told investigators defendant had been expecting Barajas to do something since defendant was incarcerated.

Barajas described defendant as getting more impatient. When asked whether defendant was "just full of shit," Barajas replied, "No." Barajas said he knew the severity of the situation and if he did not believe it was serious, he would have told defendant "to go fuck off a long time ago." Barajas described Erica Rubalcaba as willing to do anything to get rid of Ramirez, and she looked down on Barajas for not helping defendant. Barajas did not want Ramirez to get hurt and described her as defenseless and fragile.

Barajas told investigators he had received from defendant a coded "kite," or note written in prison, telling Barajas to do whatever it takes, by all means, "even if it means taking out the whole family." Defendant included Ramirez's brother in this solicitation. Barajas received this kite from someone who was released from jail. He showed the kite to Ramirez and after she read it, she burned it.

During questioning Barajas told investigators he had another kite from defendant and was willing to give it to them. When asked whether defendant talked about how to kill Ramirez, Barajas replied defendant "wanted her gone, just disappeared" so her body was not discovered; defendant did not care how Ramirez was killed. Defendant was aware Barajas went fishing and took trips where he parked on the side of the road before

6.

walking a mile to where he fished. Defendant wanted Ramirez buried in a hole where no one would find her and also wanted no ties back to himself. Defendant was "desperate to just get her eliminated."

### Barajas's Testimony

Barajas testified the second kite was a request by defendant for Barajas to commit murder. The handwritten kite was admitted into evidence. The gist of the kite was that "cutting the fence"—breaking defendant out of jail—was only the backup plan. Defendant said he thought Barajas was "bullshitting" about not being able to "get my lawyer," referring to Ramirez. Defendant told Barajas that if their situations were reversed, defendant would have already handled matters. Defendant thought the case against him was "hella weak" but "this bitch" (Ramirez) was volunteering information about which she had direct knowledge.

Defendant wrote that everything Ramirez provided was hearsay, but it was stressing him out. Defendant gave Barajas detailed directions to the home of Ramirez's grandmother. Defendant asked Barajas to "'[p]lease handle this shit ASAP, bro.'" Defendant said he would "'fix things myself'" if he could, he would return the favor, and defendant could not "'stress enough how bad I need this.'" Defendant said he loved Barajas, hoped to see results, and that Barajas was the only one who could "'make this shit go away.'"

Barajas testified he never intended to kill Ramirez. Barajas said he was still dating Ramirez when he was arrested. Although Ramirez denied to investigators that she was still dating Barajas, she confirmed that Barajas had told her about defendant's plan to harm her.

### Impeachment Evidence Admitted by Barajas

Barajas explained his motivation for assisting with law enforcement was to protect Ramirez. Barajas believed someone was eventually going to get him and no one could protect him. Barajas was impeached with prior convictions for second degree burglary in

2009 and receiving stolen property in 1996. Barajas was also facing pending charges from: (1) January 2012 for possession of methamphetamine; (2) August 31, 2012, for cultivation of marijuana for sale; (3) August 17, 2012, for possession of ammunition,[3] including ammunition found in a loaded magazine; (4) December 23, 2012, for assault with force likely to cause great bodily injury, involving an incident in which Barajas and two other men beat up a male victim who was seeing a girlfriend of one of the other men; and (5) April 17, 2013, for a misdemeanor domestic violence allegation where Barajas struck, slapped, and spit on Adrianna Alcauter.

Barajas was receiving use immunity for his testimony. Although Barajas said he was motivated to receive a shorter sentence on the pending allegations against him, he was aware he would not get a reduced sentence on the pending criminal allegations against him.

### Cross-examination of Barajas

Barajas admitted on cross-examination he sent text messages to Erica Rubalcaba in November 2013 stating defendant had not committed the current offense and had been set up by Detective Deliman who had Barajas fabricate evidence against defendant. On redirect examination, Barajas denied Detective Deliman had convinced him to fabricate fraudulent evidence against defendant.

On cross-examination, Barajas testified he received the kite from a guy named "Loco" in front of a liquor store. Detective Deliman testified that when he asked Barajas how he received the kite, Barajas refused to identify the individual who gave it to him because he did not want to involve anyone else in the investigation.[4]

---

[3]During in limine motions, the prosecutor represented that the ammunition found in Barajas's residence included a .30-06 rifle shell, .22-caliber ammunition found in the house and garage, and .40-caliber ammunition located in a bag at Barajas's feet in an automobile. The ammunition found in Barajas's house belonged to another adult who could legally possess it.

[4]Deliman did not document Barajas's refusal to identify the third party in his police report. This provided the basis for defendant's motion for a mistrial based on *Brady* error.

8.

Barajas also provided investigators with his own cell phone number. Defendant apparently had access in jail to two different cell phones but was currently using only a TracFone with prepaid minutes. Investigators also had a target number for the cell phone defendant was using. Investigators obtained a warrant to wiretap telephone calls and messages between the phones used by defendant and Barajas.

Using the wiretap, investigators intercepted additional communications between Barajas and defendant. On September 1, 2012, defendant called Barajas and asked why Barajas had forwarded earlier text messages. Barajas told defendant things were getting hot, and he had been out hunting that morning. Defendant told Barajas to delete everything on his phone.

Barajas texted defendant on September 4 that he had found someone to assist "in the footwork on that fishing trip, but wants to keep the fishing pole." Defendant replied: "'[T]hat fool can definitely keep a pole, and I'll return the favor. My word on it.'" Defendant soon texted that Barajas had "'just made my day. I see the light, bro. And like I said, I got the runbacks all day. Soon as I TD, that will get me a county bid with all that other shit out the window.'" Defendant told Barajas to erase the text messages.

Barajas called defendant on September 6 to tell him he had found someone who was "willing to go fucking go do this right" but he wanted "to keep the pole." The person was "gonna look into the attorney thingy you know what I mean …." Barajas said he ran a scenario with this person and thought they could do favors for each other. Barajas told defendant he was tapped out of cash. Defendant replied he would see what he could do.

*Defense Witnesses—Further Impeachment Evidence of Barajas*

Officer Eduardo Chavez testified he conducted a traffic stop of Barajas on August 17. During the stop, he found .40-caliber ammunition inside a bag with toiletries at Barajas's feet. Barajas was arrested for being a felon in possession of ammunition.

9.

Officer Peter Villarreal responded to a domestic violence dispatch involving Barajas's girlfriend, Adrianna Alcauter, on April 17. During an argument while they were driving, Barajas slapped her several times and spit on her head before dropping her off at her house without her purse or keys. Alcauter testified Barajas struck her head and later pushed her out of the vehicle while she still had her three-year-old child in her lap. Barajas took off with her keys and purse after dropping her off.

Officer Joseph Henderson assisted in the execution of the search warrant at Barajas's home on August 31. Henderson was working at the time with the gang violence suppression unit. During the search, investigators found 16 marijuana plants growing in the residence. Barajas was arrested and transported to the police station for questioning. Barajas was later released when he explained his marijuana prescription had expired and he was waiting for paperwork from his physician. Barajas's release, however, did not mean the charges pending against him were dismissed. Although ammunition was found in Barajas's house, investigators determined it belonged to another adult living in the residence who had no felony convictions and could legally possess ammunition.

Detective Deliman testified that during the questioning on August 31, Barajas told him he was still involved with Ramirez and had encouraged her to leave town because of defendant's threats. From his text messages, however, Deliman was aware Barajas had another girlfriend named Crystal Castillo. Deliman did not know if Barajas was only seeing one girlfriend at that time though he was aware Barajas's nickname was Playboy. During questioning by investigators, Ramirez implied that if she did not stay with him, Barajas would not cooperate with police.

Barajas was called back to the witness stand and explained on the day of his arrest he expected Ramirez to come over to his place that evening. Barajas admitted he was also seeing Crystal Castillo at the same time and was "talking" to Adrianna Alcauter.

10.

Barajas recalled being questioned by Deliman, but could not remember talking to him about Loco or saying he did not want to get others involved in the investigation.

### Rebuttal Evidence

Deputy Eric Macias of the Merced County Sheriff's Department testified he conducted a dormitory search at the correctional facility in which defendant was housed on September 21. Macias found a plastic tub in defendant's cell containing defendant's belongings. Inside, there was an envelope addressed to defendant and a black Samsung cell phone with a charger. The number assigned to the cell phone matched the number Barajas had given to Deliman. There were no contacts saved on the cell phone. There were eight text messages saved on the phone but they did not pertain to the solicitation for murder charge.

The parties stipulated to the introduction of a defense exhibit showing Barajas was blackballed as an informant because he was arrested for assault with intent to cause great bodily injury.

## DISCUSSION

### 1. Alleged *Brady* Error

### Introduction

Defendant contends the trial court erred in failing to declare a mistrial after it found *Brady* error for the People's failure to disclose during discovery that Barajas failed to tell investigators the identity of Loco, who had given Barajas a kite from defendant. Defendant argues the remedy used by the trial court—an instruction to the jury concerning the People's failure to comply with discovery—was inadequate, and the only proper remedy was to declare a mistrial. Defendant also asserts the prosecution was not forthcoming with other discovery concerning impeachment evidence against him, and his trial counsel was ineffective for acquiescing in the trial court's remedy of giving a jury instruction after arguing "strenuously, albeit unsuccessfully, for a greater remedy."

11.

We reject these contentions. First, *Brady* error did not occur because evidence presented at trial is not considered suppressed pursuant to *Brady*. In reaching this conclusion, we expressly reject defendant's argument in his reply brief that rulings of the California Supreme Court on this point are only obiter dictum. Second, we agree with the factual findings of the trial court that Barajas's testimony concerning the kite from defendant via Loco was corroborated by other testimony and wiretaps of defendant talking. Any error due to the trial court's selected remedy for the discovery violation was harmless. Finally, trial counsel filed a written motion raising *Brady* error and seeking a mistrial. In doing so, counsel preserved this issue for appeal and, consequently, did not acquiesce in the trial court's chosen remedy and was not ineffective in his representation of defendant.

### *Motion for Mistrial*

After Detective Deliman testified Barajas had received the written kite from a third party Barajas would not identify except by the name Loco, defense counsel filed a motion to dismiss the case due to the intentional suppression of exculpatory evidence pursuant to *Brady*. Defendant argued the only effective remedy was dismissal of the case with prejudice, and exclusion or striking of all references to the kite would be ineffective in assuring defendant a fair trial.

At the hearing on the motion for mistrial, defense counsel argued the police failed to identify a percipient witness, a link in the chain of evidence was missing, and the defense found out about the information too late to do anything about it. The prosecutor replied the jury had the information that Barajas failed to cooperate with the police in giving them the name of the person who delivered the kite but there was nothing more defense counsel could have done with this information had it been revealed earlier. The prosecutor also pointed out there was no information in the police report establishing the identity of the delivery person, and defense counsel had every opportunity prior to trial to

12.

pursue that information. The trial court rejected the authenticity issue because this had been established by means other than the delivery person.

The trial court found the People had a duty under *Brady* to disclose the information concerning the fact Barajas did not identify who delivered to him the kite from defendant. Accepting a discovery violation under *Brady*, however, the court further found a mistrial was a remedy of last resort. Defense counsel argued that, at a minimum, the kite should have been excluded as evidence.

The trial court observed the kite referred to a specific address where Ramirez lived with her grandparents, and Ramirez had independently laid the foundation for this information in her own testimony. Defendant also referred to Barajas in both the kite and in his text messages with a racial epithet for African-Americans, as well as referring to him as "bruh" and "bro." The prosecutor agreed the statement by Barajas should have been documented by the police department, it was not, and the failure to do so was an oversight.

Turning to the remedy to employ, the court noted that because the kite had self-authenticating characteristics, it was admissible without testimony from Barajas. The court rejected granting a motion for mistrial, excluding the kite as evidence, or excluding Barajas's testimony. After hearing a lengthy argument by defense counsel that Barajas fabricated all the evidence in the kite, the trial court ruled it would fashion a cautionary instruction to the jury concerning the *Brady* error. The parties worked on the language of the cautionary instruction with the trial court. The trial court denied the defense motion for mistrial or for the exclusion of the kite or Barajas's testimony at trial.

The cautionary instruction read to the jury was as follows.

> "Evidence was presented that Israel Barajas told Detective Deliman that he would not provide the name of the person who gave him Exhibit 134, the kite. Law enforcement was required to document this information so that it would be timely provided to defense counsel. Law enforcement breached this obligation and the information was not timely provided prior to trial. You may consider this breach in evaluating the evidence in this case."

13.

*Analysis*

The United States Supreme Court in *Brady* held "that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." (*Brady*, *supra*, 373 U.S. at p. 87.) The duty of the prosecution to disclose such evidence exists even without a request from the accused (*United States v. Agurs* (1976) 427 U.S. 97, 107), and includes impeachment as well as exculpatory evidence (*United States v. Bagley* (1985) 473 U.S. 667, 676). The duty to disclose further extends to evidence known only to law enforcement investigators and not to the prosecutor. (*Kyles v. Whitley* (1995) 514 U.S. 419, 437-438.)

There is never a real violation of *Brady* unless the nondisclosure is so serious there is a reasonable probability the suppressed evidence would have produced a different verdict. (*People v. Salazar* (2005) 35 Cal.4th 1031, 1043.) A true *Brady* violation has three components: (1) the evidence at issue must be favorable to the accused because it is exculpatory or impeaching; (2) the evidence must have been suppressed by the state, either willfully or inadvertently; and (3) prejudice must result from the evidence suppressed. (*Strickler v. Greene* (1999) 527 U.S. 263, 281-282; *People v. Lucas* (2014) 60 Cal.4th 153, 274, disapproved on another ground in *People v. Romero and Self* (2015) 62 Cal.4th 1, 53, fn. 19; *People v. Salazar*, *supra*, at p. 1043.)

Evidence presented at trial, however, is not considered suppressed under *Brady*, regardless of whether it was previously disclosed during discovery. (*People v. Lucas*, *supra*, 60 Cal.4th at p. 274; *People v. Verdugo* (2010) 50 Cal.4th 263, 282; *People v. Morrison* (2004) 34 Cal.4th 698, 715.)

In *Lucas*, a witness was cross-examined and denied ever hitting a woman. Two days after the witness's testimony, the prosecution provided the defense with a report of the witness having struck his wife and another woman during a party in December 1989. Using the police report, the defense investigators located three witnesses to the 1989

incident.  Five months after receiving the police report, the defense filed a motion alleging *Brady* error.  During the hearing on the motion, it was revealed the prosecution had only received the police report from a city attorney who was handling a civil lawsuit involving the witness and had turned the police report over to the defense.  The *Lucas* court found the late discovery did not violate *Brady* because the defense learned the information and the second prong of the test set forth in *Brady*, suppression of evidence by the state, was not satisfied because evidence presented at trial is not suppressed. (*People v. Lucas*, *supra*, 60 Cal.4th at pp. 273-274.)

On cross-examination, Barajas testified he received the kite from Loco, but could not recall most of the details concerning when he received the kite.  Detective Deliman testified that when he spoke to Barajas early during the investigation, Barajas refused to identify the person who gave him the kite because he did not want to involve anyone else in the investigation.  Deliman acknowledged he failed to document this information from Barajas.  This case is factually indistinguishable from *Lucas*.  The second prong establishing a violation of the *Brady* rule has not been satisfied.  Defendant further argues the authorities cited by the People (*Morrison*, *Verdugo*, and *Lucas*) holding *Brady* is not violated where the suppressed discovery is revealed at trial should not be followed because the doctrine they follow is obiter dictum.  As already noted, the *Lucas* case is not dictum for this point of law and its facts are indistinguishable from those presented here; we reject defendant's attempt on that basis to distinguish the holdings of *Morrison*, *Verdugo*, and *Lucas*.

Defendant embellishes his argument by contending the prosecution was not forthcoming with other discovery matters leading to a so-called "pattern of reluctance" by the prosecution to provide impeachment evidence on Barajas.  During a pretrial hearing held pursuant to Evidence Code section 402, there was also discussion of Barajas's work for police as a confidential informant.  Defendant complains these matters also were not learned until the commencement of the trial, constituting further *Brady* error.  This

15.

information, though belatedly provided to the defense, was revealed at trial and is subject to the *Morrison-Verdugo-Lucas* line of authority from our Supreme Court. Furthermore, we agree with the People these contentions were forfeited for appellate review because defense counsel did not raise them in his motion for mistrial and did not argue them to the trial court. (*People v. Fuiava* (2012) 53 Cal.4th 622, 670; *People v. Riggs* (2008) 44 Cal.4th 248, 292.)

Given the fact the evidence challenged as subject to a violation of *Brady* was made available to the defense, albeit late disclosure at trial, and the second prong to demonstrate *Brady* error was not met, we do not reach defendant's remaining contentions concerning the instruction given by the trial court to the jury or the third prong of *Brady* analysis of whether the violation was prejudicial.

Finally, defendant argues his trial counsel was ineffective for acquiescing in the trial court's curative instruction as a remedy after the court found *Brady* error. The defendant has the burden of proving ineffective assistance of trial counsel. To prevail on a claim of ineffective assistance of trial counsel, the defendant must establish not only deficient performance, which is performance below an objective standard of reasonableness, but also prejudice. A court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance. The record must affirmatively demonstrate a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. (*People v. Maury* (2003) 30 Cal.4th 342, 389.)

As noted above, the disclosure of the challenged evidence at trial cured any *Brady* error. The instruction used by the trial court was unnecessary, but certainly did not prejudice defendant. Trial counsel focused on the strongest remedies for defendant he could in both his written motion and arguments for mistrial to the trial court. Counsel argued for a mistrial as well as exclusion of Barajas's testimony and the kite itself. Counsel preserved this issue for appellate review and his representation did not fall below

16.

professional standards.  Because defendant has failed to demonstrate either prong necessary for establishing ineffective assistance of counsel, and because trial counsel worked diligently for his client throughout all of the proceedings, we reject this final argument and find it meritless.

**2.      Motion For New Trial**

*Introduction*

Defendant argues there was evidence Barajas was involved in a double homicide prior to the jury trial.  Defense counsel tried to include allegations concerning the double homicide during in limine motions concerning impeachment evidence directed at Barajas, but the trial court found the evidence connecting Barajas to the crime too attenuated. After defendant was convicted, police investigators obtained new information from a confidential informant leading to the discovery of the handgun used in the double homicide and another homicide.  Barajas was potentially connected to the disposal of the handgun by the confidential informant, which became the basis for defendant's new trial motion.  Defendant contends the trial court erred in denying his motion for a new trial based on newly discovered evidence.  We disagree.

*Background*

During in limine motions, defense counsel sought to introduce evidence he believed connected Barajas to a double homicide.  The prime suspects for the homicides were Pete Valenzuela and Patrick Cervantes.  The pending case against Barajas involved allegations of a violation of section 245 and the firing of shots allegedly by Valenzuela. Barajas was present during the assault.  The assault occurred in the same vicinity as the double homicide.  Defense counsel posited the theory Barajas was also involved in the double homicide.  In addition, there was a jail conversation in which Barajas discussed finding "money" that was actually a reference to finding the firearm used in the assault and possibly in the homicides.  Defense counsel wanted to refer to the double homicide

17.

investigation and Barajas's potential role in that case, as well as the pending assault allegation, to impeach him.

The trial court ultimately determined Barajas could be impeached with the pending assault charges, but as to the details that could be used, counsel could only refer to Barajas choking the victim. As for the pending homicide charges against Valenzuela and Cervantes, the court found there were too many potentially misleading connections to show Barajas's connection to Valenzuela.

After defendant was convicted of the instant offense on December 19, 2013, the People gave defense counsel a report from Detective Deliman describing a discussion he had with a confidential informant (CI) concerning the double homicide as well as a ballistics report tying a firearm found at Don Pedro Lake to the double homicide and an unrelated homicide. Defense counsel filed a motion for new trial based on this newly discovered evidence surmising the call Barajas made from jail to have the handgun disposed of was involved in the double homicide and was the handgun in the assault case.

Deliman talked to the CI in his office on January 6, 2014, and did not record their discussion. The CI told Deliman he had found a handwritten note taped to his car telling him he had better not testify on behalf of Barajas. The CI was scared and wanted nothing more to do with police investigations. The CI denied he had been in a barn on Shaffer Road where Valenzuela and Barajas had a conversation in which Valenzuela admitted killing the two victims. The CI said he believed the only reason Barajas had wanted the CI to live with him was to create an alibi. The CI had seen both Valenzuela and Barajas with guns before. Valenzuela carried a chrome gun like the one thrown away. The CI said Barajas had a black .380 and a black .40-caliber handgun.

Deliman explained to the CI there was evidence showing Valenzuela shot the two victims and that Barajas was not present at the time of the shootings. The CI said he went over the story with Barajas before the CI talked to police. Deliman frankly said he thought the CI was lying. The CI said he was afraid and did not want to be killed. When

18.

Deliman asked if the new information he provided was a lie, the CI replied, "Yes." The CI also said the past information he had provided to the police was true concerning overhearing Valenzuela in a barn telling Barajas he killed two people. The CI claimed he threw the threatening note taped to his vehicle into a garbage can in front of a FoodMaxx. Deliman's attempt to retrieve it was unsuccessful.

A few days after he talked to the CI, Deliman and other Merced police officers conducted a search at Lake Don Pedro based on information provided by the CI and discovered a chrome nine-millimeter semiautomatic Smith and Wesson model 59 handgun. Several expended cartridge cases and seven bullets found at the scene of the double homicide were sent with the gun to the Department of Justice for ballistics analysis. The examination revealed that 23 cartridge cases from the double homicide were matched as fired from the nine-millimeter Smith and Wesson model 59 handgun. Six of the seven bullets were fired from a single firearm.

The motion for new trial was considered at the sentencing hearing. Defense counsel argued the newly discovered evidence showed Barajas to be a person who lied repeatedly to police, committed more serious felonies, and was a far more dangerous person than previously shown. Defense counsel believed this restructured the trial. Defense counsel argued Barajas lied after being arrested on December 23, 2012, for the assault to prevent himself from being the focus of the investigation. According to defense counsel, the new evidence showed Barajas was in possession of the same firearm used during the assault on December 23, 2012, and to perpetrate the double homicide. Defense counsel told the court Barajas remained out of custody and the wrong man was in custody.

The prosecutor argued the new evidence did not overcome the statements by defendant from his cell phone in jail. The prosecutor acknowledged Barajas's credibility was heavily impeached at trial. Taking defendant's arguments one step further than defense counsel, the prosecutor speculated that if the jury believed Barajas came to have

knowledge about the location of a firearm used to kill people, this would only solidify in the minds of the jurors Barajas was exactly the kind of person who would kill Chrystal Ramirez. Defense counsel reiterated his point that Barajas was the likely shooter during the incident on December 23, 2012, and the defense would have a different trial to present to the jury.

The trial court did not believe this additional information would have made a material difference to the trier of fact. The court found sufficient other evidence developed at trial, including from defendant's cell phone, to conclude this new evidence would not have led to a different result and denied the motion for new trial.

*Analysis*

A motion for new trial may be granted pursuant to section 1181, subdivision 8, "[w]hen new evidence is discovered material to the defendant, and which he could not, with reasonable diligence, have discovered and produced at the trial." In ruling on such a motion, the trial court considers the following factors: (1) the evidence is newly discovered; (2) whether the evidence is merely cumulative; (3) the evidence is such as to probably render a different result on retrial; (4) the defendant could not with reasonable diligence have discovered and produced it at trial; and (5) the newly discovered facts be shown by the best evidence of which the case admits. (*People v. Howard* (2010) 51 Cal.4th 15, 43; *People v. Delgado* (1993) 5 Cal.4th 312, 328.)

The trial court may consider the credibility as well as the materiality of the new evidence in determining the reasonable probability of whether introduction in a new trial would render a different result. The trial court's determination of a motion for new trial rests so completely within its discretion that its ruling will not be disturbed unless a manifest and unmistakable abuse of discretion clearly appears. (*People v. Howard*, *supra*, 51 Cal.4th at p. 43; *People v. Delgado*, *supra*, 5 Cal.4th at p. 328.) A reviewing court may affirm the trial court's decision solely on the unlikeliness of a different result

on retrial without addressing all of the remaining factors. (See *People v. Delgado*, *supra*, at p. 329, fn. 7.)

There is no disagreement between the parties that defendant could not have discovered with due diligence the information the police discovered after defendant's conviction. The CI's statements to Detective Deliman, however, are factually inconsistent. The CI initially recanted earlier statements to police that he overheard Valenzuela admit to Barajas he had committed a double homicide. The CI said Barajas set up an alibi and implied Barajas knew something about the double homicide. The CI, however, later admitted to Deliman he was in fear for his life and his recantation was false. The note on the CI's car telling him not to testify on behalf of Barajas is also inconsistent with the CI's attempt to place culpability on Barajas where it did not belong.

The other problem with defendant's assertion the newly discovered evidence would strengthen his ability to further impeach Barajas is the ambiguous nature of the ballistics evidence. The police found a nine-millimeter Smith and Wesson model 59 handgun at Don Pedro Lake, but it is unclear from the police reports whether this was the weapon Barajas referenced during his call from prison. Barajas had been arrested for possession of .40-caliber ammunition. The CI referred to Barajas carrying a .380-caliber and a .40-caliber handgun. In pretrial motions the prosecutor said that in addition to the .40-caliber ammunition found at Barajas's feet in a car, a .30-06 cartridge was found in his home as well as .22-caliber ammunition. There is little or no direct evidence in the new trial motion linking Barajas to direct personal possession of the nine-millimeter Smith and Wesson model 59 handgun, though he clearly was not a stranger to guns and ammunition.

Even if we assume arguendo that Barajas sought to have someone retrieve the nine-millimeter Smith and Wesson model 59 handgun from his residence to dispose of it rather than a different gun, linking Barajas to the double homicide allegedly perpetrated by Valenzuela ultimately rests on speculation. The trial court was permitted to consider

21.

the credibility of the CI from the submitted police reports. The trial court could reasonably conclude based on the weaknesses and inconsistencies of the newly discovered evidence that it was unlikely to produce a different result at trial. In reviewing the motion before the trial court, we fail to find a manifest or apparent abuse of its discretion.

Furthermore, Evidence Code section 352 permits the trial court to use its discretion to exclude evidence if its probative value is substantially outweighed by the probability its admission would necessitate an undue consumption of time, create substantial danger of prejudice, confuse the issues, or mislead the jury. The trial court enjoys broad discretion in assessing whether the probative value of particular evidence is outweighed by concerns of undue prejudice, confusion, or consumption of time. As with a ruling on a motion for new trial, the trial court's ruling is not disturbed on appeal except on a showing the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice. (*People v. Williams* (2013) 58 Cal.4th 197, 270-271; *People v. Rodrigues* (1994) 8 Cal.4th 1060, 1124.)

The potential to confuse the jury, in effect, to create a trial within a trial concerning Barajas's potential involvement in the double homicide was great. As noted above, defense counsel's theory involving Barajas in the double homicide was based on speculation. Defense counsel's theory of Barajas firing the Smith and Wesson handgun at the assault victim is equally based on speculation. Given the inconsistent statements by the CI during one conversation with Detective Deliman and the speculation necessary to implicate Barajas as a shooter for either the double homicide or the assault, it is unlikely the impeachment of Barajas with such information would have led to a different verdict. As noted by the prosecutor and the trial court, there was strong independent evidence from defendant's cell phone implicating him in solicitation of murder. Also, Barajas's credibility was impeached with a number of prior felony convictions, as well as

22.

with pending criminal felony and misdemeanor allegations. We conclude the trial court did not err in denying defendant's motion for a new trial.

## 3. Alleged Violation of Pretrial Ruling

*Introduction*

The police reports had many references to defendant and Barajas being involved with gangs. The trial court granted defendant's in limine motion that witnesses could not refer to gang involvement by Barajas or defendant. Both attorneys were admonished to advise the witnesses of the court's ruling.

Defendant contends the prosecutor violated the trial court's ruling because while Special Agent Johnston was referring to his background and training on electronic intercepts and wiretapping, he mentioned he had made intercepts from criminal gangs. Johnston also mentioned criminal investigations involving homicides, gang conspiracies, burglaries, car thefts, narcotics sales, pimping, assaults to other gang members, and home invasions. Other times in his testimony, Johnston spoke generally about gangs in the context of the variety of offenses he had investigated. Johnston also referred to criminal groups during his testimony, explaining sometimes one criminal group committed a murder on behalf of another group. The gist of Johnston's testimony was that criminals often use slang terms and coded language in conversations with compatriots.

During his testimony, Johnston further testified concerning intercepted conversations from defendant. Johnston said he "was given background that the lawyer was referring to the female victim of this plot." Johnston told the jury he believed the term referred to Chrystal Ramirez. In the same intercepted conversation, defendant stated he was in the "'same predicament, fucked over.'" Johnston interpreted this to mean defendant felt he was "going to be screwed if he ends up getting charged or sentenced or face all [the] charges." Defendant asserts Johnston's statement of having been told who "the lawyer" referred to violated the hearsay rule and also implicated the confrontation

23.

clause of the Sixth Amendment in violation of *Crawford v. Washington* (2004) 541 U.S. 36 (*Crawford*).

Defendant further argues his attorney's failure to lodge objections to either of these comments by Johnston constituted ineffective assistance of counsel. The People initially note Johnston's testimony on both of these points came into evidence without objection by defense counsel, causing forfeiture of the assertion of prosecutorial misconduct for consideration on appeal. The defendant is excused from lodging an objection if doing so or a curative admonition from the trial court would be futile. (*People v. Hill* (1998) 17 Cal.4th 800, 820.)

We agree with the People no timely objection was made by defense counsel on either point and forfeiture is applicable, especially to the allegation of prosecutorial misconduct. The alleged confrontation clause issue, however, raises an issue of constitutional dimension. In light of this as well as defendant's ineffective assistance of counsel allegations, we reach the merits of both evidentiary contentions and reject them.

### *Testimony Referring to Gangs*

Where prosecutorial misconduct occurs, reviewing courts determine whether it is reasonably probable a result more favorable to the defendant would have occurred absent the misconduct. (*People v. Welch* (1999) 20 Cal.4th 701, 753.) Special Agent Johnston testified generally that he had experience investigating a wide variety of crimes and criminals, including gangs and members of gangs. Johnston did not specifically refer to defendant or Barajas as being involved in gangs or refer to the crime in question as being for the benefit of a gang. Although Johnston testified that sometimes one criminal group will help another, this was not a direct reference to gangs and the reference was not related to the instant offense.

Based on his testimony at trial, it is clear Johnston did not violate the trial court's pretrial ruling or that his passing references to previous criminal investigations, only some of which involved gangs, could be attributed to defendant or Barajas. What

24.

defendant ascribes as prosecutorial misconduct did not occur here. In any event, we conclude exclusion of Johnston's cryptic and unspecific reference to past criminal investigations involving gangs would not have led to a more favorable result for defendant.

*Alleged Confrontation Clause Violation*

Defendant further contends there was a violation of his right to confrontation of witnesses pursuant to the Sixth Amendment and the United States Supreme Court's decision in *Crawford*. Defendant's assertion is based on Johnston's statement during his testimony that he was informed defendant's use of the term "the lawyer" referred to the victim, Chrystal Ramirez. It would appear Johnston's statement would fall within the very strictest interpretation of the hearsay rule and *Crawford*. Rather than analyzing whether Johnston's statement was hearsay and violated the confrontation clause, however, we turn to whether the statement was prejudicial given the state of the evidence already before the jury.

The California Supreme Court has recognized the *Crawford* decision and the applicability of the Sixth Amendment of the federal Constitution as guaranteeing a defendant's right to confront adverse witnesses. (*People v. Harris* (2013) 57 Cal.4th 804, 839-840 (*Harris*); *People v. Lopez* (2012) 55 Cal.4th 569, 576.) In addition, the People may not rely on testimonial out-of-court statements unless the witness is unavailable to testify and the defendant was given a prior opportunity to cross-examine the witness. (*People v. Harris*, *supra*, at p. 840.)

Even if Johnston's statement concerning the victim's identity as "the lawyer" violates the hearsay rule and the confrontation clause, it is clear defense counsel had ample opportunity to cross-examine Johnston at trial concerning the source of his information. Assuming Johnston's statement ran afoul of the hearsay rule and *Crawford*, defendant still had to establish prejudice. In *Harris*, the defendant challenged the admissibility of DNA evidence. The People argued defense counsel failed to lodge an

25.

objection and the evidence was admissible pursuant to Evidence Code section 353. Our Supreme Court noted the issue did not have to be addressed because even if there was error, it was harmless beyond a reasonable doubt under the standard of review set forth in *Chapman v. California* (1967) 386 U.S. 18 (*Chapman*). (*People v. Harris*, *supra*, 57 Cal.4th at p. 840.) This was so in *Harris* because DNA analysis confirmed what the defendant had already admitted—he had sex with the victim—and the only issue at trial was whether the encounter was consensual. *Harris* held that under its circumstances the defendant could not be harmed by any presumed prejudice. (*Ibid*.)

Here, there was direct testimony from Barajas that defendant wanted Chrystal Ramirez killed, and among the ways defendant identified her was as "the lawyer." Detective Deliman confirmed this information based on his conversation with Barajas. Their conversation was recorded and played for the jury. Defendant's identification of Ramirez was further corroborated by the many text messages he sent to Barajas. Ramirez herself testified about the threats defendant made to her and her family. The jury had already heard and been presented with evidence from multiple sources, including the defendant's own cell phone, concerning defendant's coded language when he referred to Ramirez.

To the extent Johnston's testimony identified the victim by defendant's code name for her, his testimony was redundant to other properly admitted evidence. The crux of Johnston's testimony was not to identify Ramirez as "the lawyer," but to explain to the jury that criminals often use code in discussing their crimes and the victims of those crimes. We therefore conclude that if defendant's right to confrontation was violated by Johnston, the error was harmless beyond a reasonable doubt under the *Chapman* standard of review. (*People v. Harris*, *supra*, 57 Cal.4th at p. 840.)

The matters defendant challenges in Johnston's testimony were not the gist of the evidence he presented to the jury, and trial counsel could well have had tactical reasons for not objecting, including not appearing obstreperous to the jury. Also, because there

was either no error, or any error occurring was harmless, defendant cannot establish prejudice from trial counsel's failure to object to Johnston's testimony concerning these points. (*People v. Maury*, *supra*, 30 Cal.4th at p. 389 [prejudice must be affirmatively proved by defendant].)

**4.** **Cumulative Error**

Defendant contends the combination of the errors he asserts on appeal were prejudicial in their cumulative effect on the jury and his trial. A series of trial errors, though harmless when individually considered, may in some circumstances accrete to the level of reversible error when considered in combination. Several points defendant raises were not error. The few errors occurring in defendant's trial were harmless whether we consider them individually or collectively. Defendant was entitled to a fair trial, not a perfect one. (*People v. Cunningham* (2001) 25 Cal.4th 926, 1009; *People v. Bolden* (2002) 29 Cal.4th 515, 567-568.)

### DISPOSITION

The judgment is affirmed.

_____
PEÑA, J.

WE CONCUR:


_____
HILL, P.J.


_____
LEVY, J.